USDC SCAN INDEX SHEET











SCHWARTZ

UPPER DECK COMPANY

CG    6/6/97    15:21

3:96-CV-03408

*33*

*O.*



FILED

JUN - 5 1997

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTY SCHWARTZ, et al., | CASE NO. Civ. 96-3408-B (AJB) |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY THE PROCEEDINGS |
| vs. | |
| THE UPPER DECK COMPANY, | |
| Defendant. | |

This matter came on for hearing on defendant's motion to dismiss, or in the alternative to stay the proceedings.  After careful consideration of the moving and opposing papers, the Court hereby DENIES both motions.

## I. CASE TYPE AND JURISDICTION

This is a civil RICO class action against the manufacturer and marketer of packaged sports and entertainment trading cards for allegedly organizing and participating in a pattern of racketeering activity through the distribution of its trading cards.  This Court has jurisdiction based on 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  The defendant has filed a 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, or if the motion to dismiss is denied, a motion to stay the proceedings pending the resolution of an appeal of a similar action in Texas.

\ \ \

\ \ \

- 1 -

96CV3408

## II. BACKGROUND

**A.    The Parties**

Defendant, The Upper Deck Company ("Upper Deck") is the third largest manufacturer and marketer of sports and entertainment trading cards in the United States with its principal corporate offices in Carlsbad, California. Founded in 1988, Upper Deck is a privately held company that describes itself as the "leading manufacturer to bring involvement to the trading card business through its high quality, full-color baseball, basketball, football, hockey, motor sports and animation-style cards for sports fans and collectors." In 1992, Upper Deck's revenues from the sale of its trading cards exceeded $80 million.

The plaintiffs are a class of individuals who bring this action on behalf of those similarly situated who have purchased Upper Deck's trading cards. The representatives of the class include: (1) Marty Schwartz from Port Washington, New York; (2) Lance Kuba from Woodbury, New York; (3) Bruce Laxer from North Caldwell, New Jersey; and (4) Patricia Sullivan from New Hyde Park, New York (suing on her own behalf and as guardian *ad litem* of her son).

**B.    The Alleged "Gambling Activity"**

The amended complaint alleges that the packaging and distribution of Upper Deck's sports and entertainment cards constitutes a gambling activity. Upper Deck manufactures cards, packages them in a sealed wrapping, and distributes them to retailers across the country. Each package contains a pre-set number of cards; however, the package does not disclose or describe the specific cards contained therein. Instead, on the back of the package, in very small print, it states that the package "contains a random assortment" of numbered trading cards (regarding one specific sport or subject such as football or basketball). See FAC, Ex.'s A-J. The package also provides that "randomly inserted into these specially marked packages are the following insert cards." Id. The label then lists various types of

1  cards and the odds of receiving one of the cards in that particular package.[1]  Plaintiffs allege

2  that the random insertion of cards manufactured in limited quantity, or "chase cards,"[2]

3  constitutes illegal gambling activity sufficient to sustain a claim under the Racketeer

4  Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1964.

5  **C.     Procedural History**

6         The defendant filed a motion to dismiss the original complaint which the Court

7  granted with leave to amend on March 11, 1997.[3]  The Court found that plaintiffs could state

8  a claim for violation of civil RICO, 18 U.S.C. § 1962(c), but found that plaintiffs had not

9  adequately alleged such a violation.  On March 21, 1997, plaintiffs filed a first amended

10  complaint ("FAC").  The FAC alleges claims for violation of 18 U.S.C. § 1962(c) and for

11  violation of Cal. Bus. & Prof. Code § 17200.  Defendant has now filed a motion to dismiss

12  the FAC with prejudice, or in the alternative, to stay the proceedings.

13                              **III.  DISCUSSION**

14  **A.     Standard of Law**

15         A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6)

16  tests the legal sufficiency of the claims in the complaint.  A claim can only be dismissed with

17  prejudice if "it appears beyond doubt that the plaintiff can prove no set of facts in support of

18  his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

19  This court must accept as true all material allegations in the complaint, as well as reasonable

20  inferences to be drawn from them, and must construe the complaint in the light most

21  favorable to plaintiff.  NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986);

22  Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  The court

23  need not, however, accept every allegation in the complaint as true; rather, the court "will

24

25         [1]  Exhibit A is a package of football trading cards.  That label states that the package may include:
26  "gold version" (1:7); "Holofame Collection" (1:24); "Dan Marino Record Breaker" (1:81); "Joe Montana
    Tribute" (1:95); "Dan Marino Record Breaker Autographed" (1:433).  FAC, Ex. A.

27         [2]  Plaintiffs refer to the cards as "chase cards" because collectors allegedly "chase" these limited
    edition trading cards.
28

       [3]  This order is published at 956 F. Supp. 1552 (S.D. Cal. 1997), 97 Daily Journal D.A.R. 5905.

1  examine whether conclusory allegations follow from the description of facts as alleged by

2  the plaintiff." Holden v. Hagopian, 978 F.2d 1115, 1121 (9th Cir. 1992) (citation omitted).

3  **B.    Collateral Estoppel**

4          In addition to the instant case, groups of plaintiffs have filed four other class actions

5  against other manufacturers of sports trading cards who place "chase" cards in their packages

6  of trading cards.  On April 2, 1997, a court in the Northern District of Texas dismissed

7  plaintiffs' claims against Pinnacle Brands, Inc. with prejudice.  Price v. Pinnacle Brands,

8  Inc., Civ. No. 96-2150-T (N.D. Tex. April 2, 1997) (hereinafter the "Texas opinion" or

9  "Pinnacle action").  Plaintiffs Lance Kuba and Bruce Laxter are also plaintiffs in the

10 Pinnacle action.  Plaintiffs Marty Schwartz and Patricia Sullivan, both in her individual

11 capacity and as guardian ad litem for Sean Sullivan, are not plaintiffs in the Pinnacle action.

12 The Texas court held that plaintiffs failed to state a claim upon which relief could be granted

13 because Pinnacle's manufacture and sale of trading cards did not constitute illegal gambling.

14 The court found the element of consideration lacking because plaintiffs received exactly

15 what they paid for -- a random selection of trading cards.[4]  Plaintiffs have now appealed this

16 dismissal to the Fifth Circuit.

17         Defendant argues that this Court is bound by the Texas district court's ruling due to

18 the bar of collateral estoppel.  This is clearly not true.  First, this court's ruling on March 11,

19 1997 predates the ruling from the court in Texas on April 2, 1997.[5]  This Court found that

20 plaintiff could state a claim for violation of civil RICO based on Upper Deck's manufacture

21

22         [4] The Texas court stated that "Plaintiffs do not allege that they received something different than
   precisely what they bargained for: six to twenty cards in a pack with a chance that one of the cards may
23 be a Ken Griffey, Jr.  Further, assuming that a pack does not contain a chase card, Plaintiffs do not allege
   that the value of the cards that they did receive is less than the consideration paid."  Texas op., p. 5.  This
24 Court found the same deficiency in plaintiffs' original complaint, but the Court allowed plaintiffs leave
   to amend so that they could allege that the consideration they paid was, in part, for the cards they did
25 receive, and in part, for the chance of receiving a valuable chase card.  In the FAC, plaintiffs have
   specifically alleged that they paid consideration for the chance of winning a valuable prize.  FAC ¶¶ 17,
26 31.

27         [5] Since this Court's earlier ruling was, in part, adverse to the defendant, Upper Deck, this decision
   would not collaterally estop Pinnacle from litigating its motion to dismiss in the Texas action because
28 Pinnacle is not a party to this action.  Collateral estoppel generally cannot operate to bar someone from
   litigating an issue which was decided in a prior case to which that person was not a party.

                                    - 4 -                                         96CV3408

1 and sale of "chase" cards, but dismissed the complaint because plaintiff had failed to

2 properly allege such a RICO violation.  Since this Court reached its decision prior to the

3 Texas court's decision, collateral estoppel cannot be used to retroactively overrule a prior

4 order of this Court.[6]

5       Second, not all of the plaintiffs in this action are identical or in privity with plaintiffs

6 in the Pinnacle action.  The three requirements for collateral estoppel are: (1) that the issue

7 decided in the prior adjudication was identical with the one presented in the present action;

8 (2) that the decision in the first action was a decision on the merits; and (3) that the party

9 against whom the plea is asserted was a party or in privity with the party to the prior

10 adjudication.  Bernhard v. Bank of America, N.T.S.A., 19 Cal. 2d 807, 813 (1942); Durkin v.

11 Shea & Gould, 92 F.3d 1510, 1515 (9th Cir. 1996); Bates v. Jones, 904 F. Supp. 1080, 1088

12 (N.D. Cal. 1995).

13       Plaintiffs argue (1) that although similar, the issue in the Pinnacle action is not

14 identical, and (2) that several of the plaintiffs in this action are different.  Both cases are

15 class actions.  The Pinnacle action is brought on behalf of all purchasers of Pinnacle trading

16 cards, and this action is brought on behalf of all purchasers of Upper Deck trading cards.

17 While there may be some overlap between these two classes, there are certainly people who

18 have purchased cards from one manufacturer without purchasing any from the other

19 manufacturer.

20       Non-parties have been found in privity with parties to a prior action under very

21 limited conditions.

22       The privity doctrine precludes non-parties from relitigating a case when there
      is "such an identification of interest of one person with another as to represent
23       the same legal rights."

24 Bates, 904 F. Supp. at 1088.

25       Due process requires that the nonparty have had an identity of interest with and
      adequate representation by the losing party in the first action, and that the
26

27      [6] The Texas court even cited to and attempted to distinguish this Court's March 11, 1997 Order.
See Texas op., p. 5.  The Texas court recognized this Court's decision as contrary, existing authority
28 when it made its decision.  To argue that this Court is now bound by the subsequent Texas decision is
unpersuasive.

circumstances have been such that the nonparty should reasonably have expected to be bound by the prior adjudication.

Id. at 1089 (citing Clemmer v. Hartford Ins. Co., 22 Cal.3d 865, 875 (1978)).

Nonparties have been found in privity with parties in two instances: (1) when a non-party actually contested the former action or had a proprietary or financial interest in and controlled the prior action (i.e. parent corp of wholly owned subsidiary who was a party); and (2) when the party in the first action might fairly be treated as acting in a representative capacity for the non-party. Id.

Defendant makes the blanket statement that the "community of interest" between the non-party and the party plaintiffs justifies the court's application of collateral estoppel against the non-party plaintiffs. Defendant has failed to demonstrate, however, that the non-party plaintiffs either controlled the prior action or that the plaintiffs in the prior action were acting as representatives for them. Moreover, the class of plaintiffs in this action is clearly different from the class in the Pinnacle action. For these reasons, collateral estoppel does not bar plaintiffs in the instant action from proceeding with their claims against Upper Deck.

Defendant cites Detroit Police Officers Assn. v. Young, 824 F.2d 512 (6th Cir. 1987), in which a class of patrol officers sued the city for discrimination and lost, and then a class of police sergeants sued the city for discrimination based on the same city policy. The court held that because there was such a strong community of interest between the patrolmen and sergeants and because the patrolmen class had adequately represented the sergeants, the sergeants were collaterally estopped from litigating issues which had been litigated in the previous suit. Id. at 516-17.

Collateral estoppel is not appropriate in the instant case because the defendants are different companies and it has not been demonstrated that Pinnacle's alleged conduct is identical to Upper Deck's. As plaintiffs point out, just because a class action is brought against one automobile manufacturer for fraudulent conduct does not mean that a class bringing an action against a different automobile manufacturer for similar fraudulent conduct would be barred by collateral estoppel. Further, named plaintiffs in this suit purchased cards in New York and New Jersey and the Court has analyzed whether Upper Deck's activities

96CV3408

1   constitute illegal gambling in New York or New Jersey.  The Texas court applied Texas

2   law.[7]  Although the issue is similar, the application of different law renders it sufficiently

3   different to prevent the Court from collaterally estopping plaintiffs from proceeding with this

4   litigation.

5       Moreover, plaintiffs in this action have filed an amended complaint alleging that they

6   paid consideration for the chance of winning a valuable chase card.  It was the failure to

7   make such an allegation that served as the basis for the Texas court's decision.  The addition

8   of this allegation in plaintiffs' amended complaint in this action makes the issue before this

9   Court sufficiently different from that in front of the Texas court to prevent the application of

10  collateral estoppel.

11  **C.    Whether Plaintiff Can State a Claim Under Civil Rico**                                              ,

12      Title 18 U.S.C. section 1962(c) provides:

13      It shall be unlawful for any person employed by or associated with any
        enterprise engaged in, or the activities of which affect, interstate or foreign
14      commerce, to conduct or participate, directly or indirectly, in the conduct of
        such enterprise's affairs a pattern of racketeering activity[.]

15  18 U.S.C. § 1962(c).  To state a cause of action under RICO, plaintiffs must establish that

16  defendant engaged in a pattern of racketeering activity which has injured them in their

17  business or property. See <u>Sedima v. Imrex Co., Inc.</u>, 473 U.S. 479 (1985).  RICO, in

18  pertinent part, defines "racketeering activity," as "any act or threat involving. . .gambling. . .

19  which is chargeable under State law and punishable by imprisonment for more than one

20  year." 18 U.S.C. § 1961(1)(A).

21      Plaintiffs in this action purchased their Upper Deck trading cards in New York and

22  New Jersey.  Therefore, the issue is whether defendant's conduct constitutes illegal gambling

23  under New York or New Jersey law.  This issue was previously addressed in the Court's

24

_____

25      [7] The Texas court stated that Texas law on gambling contains the same three elements as New
    York and New Jersey law: (1) chance, (2) consideration, and (3) prize.  Texas op., p. 2.  The Texas court
26  then found that the element of consideration was lacking because plaintiffs received what they paid for --
    a package of trading cards.  The court did not cite any Texas statute or decision for this proposition.
27  Under New York and New Jersey law, as explained <u>infra</u> pp. 8-12, as long as plaintiff alleges that a
    portion of the price paid for the package of cards is consideration for the chance of winning a valuable
28  prize, then plaintiffs can state a claim for violation of New York and New Jersey gambling laws.  It is
    unclear whether Texas law differs from New York and New Jersey law on this point.

1  March 11, 1997 Order.  Plaintiffs argue that the Court's prior order is the law of the case and

2  cannot be revisited in later motions to dismiss.  The Supreme Court has stated that "when a

3  court decides upon a rule of law, that decision should continue to govern the same issues in

4  subsequent stages in the same case." <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983).  The

5  Court may depart from its earlier holding if it finds that its earlier decision was clearly

6  erroneous.  <u>Id.</u>  In this respect, the standard for departing from the law of the case is very

7  similar to the standard for reconsideration of an order or judgment under Fed. R. Civ. P.

8  60(b).  <u>See</u> <u>School Dist. No. 1J, Multnomah County v. ACands, Inc.</u>, 5 F.3d 1255, 1263 (9th

9  Cir. 1993), <u>cert. denied,</u> 114 S.Ct. 2742 (1994) (relief from judgment is appropriate if "the

10  district court (1) is presented with newly discovered evidence, (2) committed clear error or

11  the initial decision was manifestly unjust, or (3) if there is an intervening change in

12  controlling law").  For this reason, the Court views defendant's motion to dismiss the Civil

13  RICO cause of action as a motion to reconsider its earlier order, and will apply the clear

14  error standard of review.

15        **1.**     **Defendant's Alleged Conduct Violates New York and New Jersey**
16              **Gambling Laws**

17      Plaintiffs allege that they purchased packages of Upper Deck trading cards for the

18  chance of obtaining a chase card which has a readily ascertainable value in the secondary

19  market.  Certain limited edition autographed cards such as those of Michael Jordan and Joe

20  Montana are worth hundreds of dollars.  Their value is readily ascertainable in Beckett's

21  monthly trading card magazine or other similar publications.  When someone enters a hobby

22  shop or trading card shop and purchases a package of Upper Deck cards, that person can

23  immediately sell any chase cards he receives to the shopowner for the value quoted in the

24  price guides.

25      This is somewhat analogous to scratch-off lottery tickets that can be purchased in

26  most convenience stores.  Customers purchase the cards, scratch them off, and then can cash

27  in winning tickets.  Granted, a package of baseball cards contains other cards with some

28  value, whereas a scratch-off lottery ticket has no value unless it is a winner.  The purchase

price for Upper Deck's cards allegedly has two components -- the consideration for 'regular'

1 | or 'common' trading cards, and consideration for the chance of winning a 'chase' card.

2 | Common cards exist in every package and are worth a few cents each.  The odds of receiving

3 | a chase card are printed on the back of the package of trading cards and can reach 433:1 for

4 | certain autographed cards. See FAC, Ex. A.  As long as plaintiffs allege that a portion of the

5 | purchase price is consideration for the chance of winning a "chase" card, they have

6 | adequately alleged a cause of action under civil RICO.  See FAC ¶¶ 17, 31.

7 |      Upper Deck's alleged conduct violates the gambling laws of both New York and New

8 | Jersey.  Illegal lotteries are governed by Article 225 of the New York Penal Code.  Section

9 | 225(10), defines an illegal lottery as:

10 |        an unlawful gambling scheme in which (a) the players pay or agree to pay
11 |        something of value for chances, represented and differentiated by numbers or
   |        by combinations of numbers or by some other media, one or more of which
   |        chances are to be designated the winning ones; and (b) the winning chances are
12 |        to be determined by a drawing or by some other method based upon the
   |        element of chance; and (c) the holders of the winning chances are to receive
13 |        something of value.

14 | New Jersey defines an illegal lottery as:

15 |        [A]n unlawful gambling scheme in which (a) the players pay or agree to pay
   |        something of value for chances, represented and differentiated by numbers or
16 |        combinations of numbers or by some other media, one or more of which
   |        chances are to be designated the winning ones; and (b) the winning chances are
17 |        determined by a drawing or by some other method based upon the element of
   |        chance; and (c) the holders of the winning chances are to receive something of
18 |        value.

19 | N.J. Stat. Ann. Title 2C Chapter 37 § 1.  The New Jersey definition of illegal lottery is

20 | identical to New York's definition, and has the same basic three elements of chance,

21 | consideration and prize.

22 |      Plaintiffs argue that Upper Deck's distribution of "chase cards" satisfies the three

23 | elements of a lottery: chance, consideration, and prize.  The consideration is the portion of

24 | the purchase price of a package of cards paid for the chance of obtaining a "chase" card.  The

25 | chance is the probability that a "chase" card might be contained in one of the packages.  The

26 | prize is the chase card itself with an immediately ascertainable value in the secondary

27 | market.

28 |      Courts in New York have found similar schemes to be illegal gambling.  In People v.

1  Miller, 271 N.Y. 44 (1936), theater patrons who purchased movie tickets would also receive

2  a chance to win a cash prize.  Before the movie, the theater owners would spin a wheel on

3  stage to determine which ticket holder won the prize.  The New York Court of Appeals held

4  that this constitutes an illegal lottery because the purchase price was paid, in part, for the

5  right to see the movie, and in part, for the chance of winning the prize.  Id. at 47-48; see

6  People v. Runge, 3 N.Y.Cr.R. 85 (sale of a piece of chewing gum for a penny which secured

7  a chance to draw a prize constitutes a lottery).

8          Similarly, People v. Lavin, 179 N.Y. 164 (1904), involved a scheme where 100 cigar

9  bands could be sent in with a guess as to the number of cigars which would be taxed during a

10 specific month.  The closest guesses would receive cash prizes.  The New York Court of

11 Appeals held that this was an illegal lottery because consideration was paid, in part, to buy

12 the cigars, and in part, to obtain the cigar bands that made one eligible to participate in the

13 lottery.

14         In Valentin v. El Diario La Prensa, 427 N.Y.S.2d 185 (1980), the Civil Court of the

15 City of New York held that a newspaper contest for the "King of the Infants" in which

16 people paid to vote for their favorite infant, and the winning infant would win a cash prize,

17 was an illegal lottery.  The Court explained that the consideration was the amount paid to

18 vote, the prize was the cash prize (by law the infant could not receive the prize, so the

19 guardian would, and the nature of the contest was such that the guardian would be the one

20 purchasing the votes), and the chance was the fact that the winner was chosen by the number

21 of votes received.

22         Defendant relies on the only New Jersey decision to apply its illegal lottery statute in

23 arguing that its sale of "chase" cards does not constitute an illegal lottery.  In State v. Bey,

24 261 N.J. Super. 182 (App. Div. 1992), the appellate court overturned the conviction of the

25 organizer of a pyramid scheme under N.J. Stat. Ann. Title 2C Chapter 37 § 1.  The court

26 noted that the element of chance "must be represented by and differentiated by numbers or

27 combinations of numbers or by some other media.  In addition, the definition specifies that

28 the winning chances are to be 'determined by a drawing or by some other method based

96CV3408

1    upon the element of chance.'" Id. at 187 (citations omitted).

2            Plaintiffs adequately allege that Upper Deck's sale of trading cards satisfies this

3    requirement. The element of chance is represented by the random assortment of trading

4    cards found in a package of Upper Deck cards. The New Jersey court was thinking of the

5    numbers a person receives when he plays the lottery, but any object can serve as a

6    representation of plaintiff's chance to win. Here, plaintiffs purchased packages of trading

7    cards. The packages are sealed and contain a random assortment of trading cards. It is

8    unclear what physical shuffling process is used by Upper Deck to randomize the cards once

9    they are manufactured, but the packages state that "[t]his pack contains a random

10   assortment" of trading cards. FAC, Ex. A. A purchaser does not know whether he has

11   received a "chase" card until he opens the package. Thus, the random assortment of cards

12   placed in a sealed package is the medium in which the chance of winning a "chase" card is

13   embodied.

14           Defendant also argues that whatever value the "chase" cards have is based solely on

15   the "subjective feelings and whims of sports cards fans." This is untrue. The value of the

16   "chase" cards is a dollar value set by the secondary market and readily ascertainable in

17   published price guides. FAC ¶ 4. Plaintiffs allege that they purchase these cards for the

18   chance of winning a chase card which can then be immediately sold in the secondary market.

19   FAC ¶ 4. The ready availability of the secondary market makes these chase cards almost as

20   good as cash. It takes no more effort to sell them back at a hobby shop than it does to turn in

21   a winning scratch-off lottery ticket. Plaintiffs point out that the New Jersey Attorney

22   General has opined that the statutory definition of "something of value" encompasses money

23   or property, or tangibles or intangibles (including personal services). Op. N.J. Atty. Gen. No.

24   6-1983 (June 1, 1983) (bus tour promotion where bonus available only to those bus patrons

25   selected by drawing constitutes unlawful gambling because part of patron's ticket price was

26   consideration for chance of winning the bonus). Plaintiffs adequately allege that the chase

27   cards have a cash value readily ascertainable in the secondary market which makes them a

28   valuable prize.

                                            - 11 -

1    Defendant argues that the fact that people in the secondary market will pay cash for
2  these cards "is beyond Upper Deck's control." Def. Mem. P&A's p. 13. This argument is
3  disingenuous. The manufacturers of trading cards are inextricably linked to the secondary
4  market. The relative numbers of cards produced by manufacturers has a direct effect on their
5  value in the secondary market. In order to inflate the value of cards on the secondary market,
6  manufacturers produce the most popular cards in limited numbers. Simple supply and
7  demand economics dictates that high demand coupled with low availability will cause the
8  price to skyrocket. When the price of cards on the secondary market rises, it allows the
9  manufacturers to charge more for their sealed packages of cards. The more the chase card is
10  worth, the more people are willing to pay for the chance of receiving a valuable chase card.

11    If the manufacturers were truly out to sell people cards containing their favorite
12  players, they would produce larger numbers of cards of the most popular players. This way,
13  everyone who buys a pack of cards would be almost guaranteed to receive the cards they
14  desire. Instead, by manufacturing cards of the most popular players in limited quantities,
15  purchasers are required to buy many more packages of cards in order to obtain the cards they
16  desire.

17    The Court finds that plaintiffs have stated a cause of action under RICO because they
18  allege that the prices of the chase cards on the secondary market have been manipulated to
19  the point where they are disproportionately higher than the value of common cards. They are
20  so valuable that people gamble by buying many packages of cards in the hopes of receiving a
21  chase card which can then be exchanged for cash. The gravamen of plaintiff's complaint is
22  not that people purchase the packages to obtain a card of their favorite player, but that they
23  purchase the packages to obtain a small piece of cardboard which can be exchanged for cash.
24  Whether the piece of cardboard contains lotto numbers, scratch-off boxes, or the face of
25  Michael Jordan, it is still gambling.

26    In sum, by alleging that Upper Deck's manufacture and sale of "chase" cards contains
27  the elements of chance, consideration and prize, plaintiffs have stated a claim under 18
28  U.S.C. § 1962(c). On a motion to dismiss, the Court must accept as true all allegations in

96CV3408

1  plaintiffs' complaint.  Parks School of Business, 51 F.3d at 1484.  The Court declines to
2  change its earlier ruling.

3      **2.      Whether Plaintiff Adequately Alleges Injury Under 18 U.S.C. § 1962**

4      Upper Deck argues that plaintiffs lack standing because they have not sustained an
5  "injury" to support their RICO claim.  Plaintiffs must suffer an injury to their business or
6  property.  18 U.S.C. § 1964(c).

7      As noted in the Court's March 11, 1997 Order, the law is clear that the plaintiffs
8  cannot recover for their disappointment or other feelings experienced in not obtaining "chase
9  cards."  See Oscar v. University Students Co-operative Ass'n, 965 F.2d 783 (9th Cir.)
10  (holding that a neighbor renting an apartment across from a building where the tenants sold
11  drugs lacked standing because annoyance caused by the drug related activities did not
12  constitute an "injury" for purposes of RICO), cert. denied, 506 U.S. 1020 (1992).  Likewise,
13  they cannot recover for a developed "habit" of buying trading cards to obtain the "chase
14  cards," see Allman v. Philip Morris, Inc., 865 F. Supp. 665, 667-68 (S.D. Cal. 1994)
15  (addiction to nicotine not an injury to business or property even if it has economic
16  consequences), or speculative "lost profits" in the secondary market. See Imagineering, Inc.
17  v. Kiewit Pacific Co., 976 F.2d 1303 (9th Cir. 1992), cert. denied, 507 U.S. 1004 (1993)
18  (subcontractors' lost profits claim too speculative).  Upper Deck also argues that plaintiffs
19  cannot recover their purchase price because they have already received the fair equivalent of
20  that price, packages of trading cards.

21      Plaintiffs are not suing because they were disappointed over not getting a Ken
22  Griffey, Jr. card, but because they have suffered gambling losses.  They allege that a portion
23  of the price paid for a package of Upper Deck cards is consideration for a chance to receive a
24  chase card.  They do not care whose face is on the card; they only care about its value in the
25  secondary market.  According to plaintiffs' allegations, this is no different than dropping a
26  quarter in the slot machine.  Plaintiffs have suffered a tangible loss in that they have spent a
27
28

1  fixed amount on chances to receive chase cards.[8]  As the Court noted in its previous order,

2  gambling losses are recoverable under both New York and New Jersey law.  New York

3  General Obligations Law Chapter 24-A § 5-423 provides:

4      Any person who shall purchase any share, interest, ticket ... or [] any portion of
       any lottery, may sue for and recover double the sum of money, and double the
5      value of goods or things in action, which he may have paid or delivered in
       consideration of such purchases, with double costs of suit.

6
7  New Jersey Statutes Annotated Title 2A Chapter 40 § 2 provides:

8      Whoever pays, delivers or deposits any money, property or thing in action
       upon the event of any wager or bet prohibited by this chapter or by any law of
       this state, may sue for and recover the same of the winner, or person to whom
9      the same shall be paid or delivered[.]

10  Under both of these statutes, plaintiffs have standing to sue to recover their gambling losses,

11  but they must deduct the value of the cards they have received.

12       Plaintiffs have lost property, their money, and can recover that lost property under

13  RICO.  See 18 U.S.C. § 1964(c).  The Court declines to change its earlier ruling.

14  **D.    Whether Plaintiff Can State a Claim Under Bus. & Prof. Code § 17200**

15       In their amended complaint, plaintiffs assert a cause of action for unfair competition

16  pursuant to Cal. Bus. & Prof. Code § 17200 et seq.  Under this statute, the Court may enjoin

17  any person "performing or proposing to perform an act of unfair competition within this

18  state[.]" Cal. Bus. and Prof. Code § 17203.  Unfair competition is defined as any "unlawful,

19  unfair or fraudulent business practice and unfair, deceptive, untrue or misleading

---

[8] Plaintiffs will have to establish what portion of the purchase price of packages of Upper Deck cards is consideration for the common cards received and what portion is consideration for the chance of receiving a chase card.  They have only suffered damage for the amount they have expended on chances of winning chase cards.  The amount they have lost must be offset by the value of any chase cards received.  These cards are the equivalent of gambling winnings, and plaintiffs can only recover their net losses; total losses minus their winnings.

If the odds are set correctly, then there should be no net gambling losses.  For instance, if the odds of receiving a chase card are 1:100, the amount of consideration paid for the chance of receiving the card is $1, and the value of the card is $100, then there should be no net gambling losses.  If a person purchases 1000 chances to win, expending $1000, statistically, he should receive 10 cards worth $100 each, for a total value of $1000.  Thus, he will have spent $1000 for cards worth $1000, and will not have suffered a gambling loss.

Casinos make money by either adjusting the odds so that they are greater while keeping the payout the same or, if the odds are fixed as with dice, lowering the winning payout.  For instance, the casino might only pay $90 for a winning card, so that it makes a ten percent profit on this type of gambling.  The record before the Court does not address whether the odds of receiving a chase card are correctly reflected in the value of those cards on the secondary market.

- 14 -

96CV3408

1  advertising[.]" Cal Bus. and Prof. Code § 17200.

2  Plaintiffs' complaint merely states that "Upper Deck's marketing of sports and

3  entertainment trading cards, as described herein, constitutes an unlawful, unfair and/or

4  fraudulent business practice[.]" FAC ¶ 57.  Plaintiffs argue that since defendant's

5  manufacture and sale of trading cards violates both RICO and New York and New Jersey

6  gambling statutes, it is an unlawful business practice and can be enjoined under Cal. Bus. &

7  Prof. Code § 17203.

8  Section 17200 "has been liberally construed so as not to be limited to traditional

9  anticompetitive practices." People v. Erotic Words and Pictures, Inc., 106 Cal. App. 3d 315,

10  318 (1980) (applying section 17200 to the commercial distribution of obscene materials).

11  The California Supreme Court has stated that the addition of the word "unlawful" to the

12  statute in 1963 was intended "to extend the meaning of unfair competition to anything that

13  can properly be called a business practice and that at the same time is forbidden by law."

14  Barquis v. Merchants Collection Ass'n, 7 Cal.3d 94, 112-13 (1972).  The California

15  Supreme Court further explained that

16  > [i]n essence, an action based on Business and Professions Code section 17200
   > to redress an unlawful business practice 'borrows' violations of other laws and

17  > treats these violations, when committed pursuant to business activity, as
   > unlawful practices independently actionable under section 17200 et seq. and

18  > subject to the distinct remedies provided thereunder.

19  Farmers Ins. Exchange v. Superior Court, 2 Cal.4th 377, 383 (1992).  In Erotic Words and

20  Pictures, plaintiff alleged that defendant had commercially distributed obscene materials for

21  over a year, and the court held that plaintiff had adequately alleged an unlawful business

22  practice.  Erotic Words and Pictures, 106 Cal. App. 3d at 319.

23  In Hewlett v. Squaw Valley Ski Corp., 63 Cal. Rptr.2d 118 (April 22, 1997), Squaw

24  Valley resorted to self help when litigation was threatened over its proposed expansion by

25  cutting down over 1,800 trees in the area in which it intended to expand.  Plaintiffs filed suit

26  alleging an unlawful business practice in violation of § 17200.  The court explained that an

27  unlawful business practice requires more than a single transaction; it requires a pattern of

28  conduct or an ongoing course of conduct. Id. at 130.  The court further explained that §

1  17200 does not require an intent to violate the law.  It imposes strict liability on those who

2  commit an unlawful business practice.  Id.  Finally, the court explained that to be unlawful,

3  the business practice can violate civil, criminal, state, federal, municipal or court-made law.

4  It is not necessary for the predicate law to be a California statute or that the predicate law

5  provide for private civil enforcement.  Id. at 135-45.  The court concluded that Squaw

6  Valley's timber harvesting was illegal and constituted an unlawful business practice.

7        In this case, Upper Deck's manufacture and sale of packages of trading cards

8  throughout the United States is clearly an ongoing business practice.  As explained above,

9  plaintiffs have adequately alleged that Upper Deck's activities violate RICO and New York

10  and New Jersey gambling laws.  These alleged violations may serve as predicate acts for a

11  violation of § 17200.  Accordingly, plaintiffs have adequately alleged a violation of Cal. Bus.

12  & Prof. Code § 17200 et seq. and defendant's motion to dismiss this claim is DENIED.

13  **E.    Motion to Stay Proceedings**

14        In the event that the Court does not dismiss plaintiffs' complaint, defendant seeks to

15  stay this case and all discovery in this case pending resolution of the appeal in the Pinnacle

16  action.  Upper Deck argues that even if this Court is not bound to follow the Texas decision

17  by reason of collateral estoppel, it should still stay the proceedings until the Fifth Circuit

18  rules because their decision will be informative and might persuade this Court to alter its

19  ruling.  The Ninth Circuit has held that

20        [a] trial court may, with propriety, find it is efficient for its own docket and the
      fairest course for the parties to enter a stay of an action before it, pending
21       resolution of independent proceedings which bear upon the case.

22  Mediterranean Enterprises, Inc. v. Ssangyong Corp., 708 F.2d 1458, 1465 (9th Cir. 1983).

23  Even if the other proceedings do not control the outcome in the action before the court, a

24  stay may be appropriate.  Agcaoili v. Gustafson, 844 F.2d 620, 624 (9th Cir. 1987).  The

25  Ninth Circuit reviews a district court's decision to grant a stay for abuse of discretion.  Id.

26        Before the Court will grant a stay, there must be good cause for the stay.  See Fed. R.

27  Civ. P. 26(b).  This requires the Court to look at the benefit to the Court from the stay, the

28  prejudice to plaintiffs from the stay, and the prejudice to defendant if the stay is not granted.

1  The burden of demonstrating good cause lies with the moving party, in this case Upper Deck.

2  See Gray v. First Winthrop Corp., 133 F.R.D. 39, 40 (N.D. Cal. 1990).

3        The Court does not see the utility of a stay.  First, this Court applied New York and

4  New Jersey gambling laws to Upper Deck's conduct while the Texas court applied Texas

5  law.  Second, the Texas court dismissed plaintiffs' complaint for failure to allege that

6  consideration was paid for the chance of winning a chase card.  In the instant case, the

7  original complaint was dismissed for this reason, but plaintiffs have filed an amended

8  complaint in which they specifically allege that they have paid consideration for the chance

9  to win a chase card.  FAC ¶¶ 17, 31.  Since the operative complaints are different on this

10  critical point, even if the Fifth Circuit affirmed the district court, it would be of only

11  tangential relevance to this case.  Third, no showing has been made that Pinnacle's conduct

12  is identical to Upper Deck's conduct.  Discovery is required to determine how many cards of

13  each type Upper Deck produces, the method by which they are randomly inserted into

14  packages, and the relationship between the pricing of packages of Upper Deck cards and the

15  value of chase cards on the secondary market, as well as many other issues.  These facts

16  could turn out to be quite different from the way in which Pinnacle conducts its business.

17  There is no way to determine this without discovery.

18        Further, the Court does not find that Upper Deck will be prejudiced by denying a stay.

19  Upper Deck argues that it will suffer competitive injury if it is forced to submit to discovery

20  while the other trading card manufacturers do not have to participate in discovery.

21  Apparently, Upper Deck feels that the money it will have to expend in attorney's fees and to

22  produce documents in response to discovery requests will cut into its profits or force it to

23  raise prices, putting it at a competitive disadvantage when compared to its competitors.  This

24  is the nature of litigation.  When a company engages in conduct which is allegedly illegal, it

25  may be sued and may have to respond to discovery requests.  As long as this Court finds that

26  plaintiffs state a claim for relief, they are entitled to discovery under Fed. R. Civ. P. 26.

27        Finally, it does not appear that plaintiffs would be prejudiced by a stay either.

28  Plaintiffs argue that any delay may result in documents being lost or destroyed or memories

1  fading.  Given that a stay, if it were granted, would only last until the Fifth Circuit's

2  decision, this concern seems overblown.

3         Given that a stay would be of limited utility and that defendant has failed to

4  demonstrate significant prejudice from continued discovery, the Court DENIES defendant's

5  motion to stay the proceedings and to stay discovery pending the Fifth Circuit's decision in

6  the Pinnacle action.

7                          **IV.  CONCLUSION**

8         The Court finds that plaintiffs are not collaterally estopped from litigating this case

9  because (1) this Court reached its decision first and cannot be retroactively overruled by a

10 later Texas decision, (2) some of the plaintiffs and the only defendant in this action are

11 different from those in the Pinnacle action, (3) different state laws are being applied by the

12 different courts, and (4) the operative complaint in this action contains allegations which

13 differ from the Pinnacle complaint on key issues.  Further, the Court finds that plaintiffs state

14 a claim under civil RICO and declines to change its earlier ruling.  For these reasons, the

15 Court DENIES defendant's motion to dismiss and DENIES defendant's motion to stay the

16 proceedings and discovery.

17        IT IS SO ORDERED.

18

19

20 Dated: _____   JUN - 5 1997

21                                   UNITED STATES DISTRICT JUDGE

22 cc:    All Parties

23

24

25

26

27

28

- 18 -                                          96CV3408